**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**EL CAMINO COMMUNITY COLLEGE
DISTRICT and Stuart E. Marsee,
Defendants-Appellants.**

No. 78–2720.

United States Court of Appeals,
Ninth Circuit.

June 21, 1979.

Rehearing Denied Aug. 9, 1979.

Leroy W. Blankenship, Deputy County Counsel, Los Angeles, Cal., for defendants-appellants.

---

Walter W. Barnett, Mark L. Gross, Civil Rights Division, Appellate Section, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before CHAMBERS and HUFSTEDLER, Circuit Judges, and SOLOMON,* District Judge.

HUFSTEDLER, Circuit Judge:

The Government brought this suit to compel El Camino Community College District ("College") and its President and District Superintendent, Marsee, to supply the Office for Civil Rights ("OCR") of the Department of Health, Education and Welfare ("HEW") with information about the composition of the College's workforce and student body, its recruiting and hiring procedures for academic and other positions, its student recruiting procedures, and its financial and academic assistance programs for students. The College declined the request unless the request was limited to federally-assisted programs or activities. OCR refused to limit its request, efforts to secure voluntary compliance failed, and the Department of Justice filed this complaint seeking a declaratory judgment that the College's refusal to comply with the request for information violated Title VI. The Government sought a declaratory judgment and an injunction. Following cross-motions for summary judgment, the district court granted a permanent injunction and declaratory relief. The College and Marsee appeal.[1]

On appeal the College argues that the administrative regulations promulgated by HEW (45 C.F.R. Part 80) were in excess of the statutory authority granted by Title VI of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d, *et seq.*) because the regulations purport to authorize the agency to investigate educational programs, activities, and general employment practices of the College which do not receive federal financial assistance. Because the College did not challenge the validity of the regulations below, it cannot do so for the first time on appeal. Our review is limited to the only question properly raised below: Do the statutes and regulations prevent HEW from seeking information about programs or activities receiving no federal assistance?

The College operates a public community college located in Torrance, California, which receives federal financial assistance for some of its programs. In October, 1973, OCR began an investigation of a complaint that the College discriminated against Spanish surnamed persons in employment and educational services. OCR requested information about the racial and sexual composition of the College's workforce and student body, about its recruiting and hiring procedures, and its programs for granting financial and academic assistance to students.

Title VI of the 1964 Civil Rights Act prohibits discrimination on the basis of race, color or national origin under any program or activity receiving federal financial assistance. (42 U.S.C. § 2000d.) Under regulations promulgated by HEW to enforce Title VI, OCR is directed to conduct investigations to ascertain possible failures to comply with Title VI. (45 C.F.R. § 80.7(c).) Each recipient of federal funds is required to give access to OCR's officials to its "books, records, accounts, and any other sources of information, and its facilities as may be pertinent to ascertain compliance . . ." (45 C.F.R. § 80.6(c).)

The regulation that strikes to the heart of the College's contentions is the requirement that every applicant for federal financial assistance through HEW must execute an assurance of compliance with HEW's regulations imposing virtually an open-file examination of all of the applicant's records and programs. The pertinent regulations provide:

---

* Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

1. Hereafter the College and Dr. Marsee will be referred to collectively as "College."

"(1) In the case of any application for Federal financial assistance to an institution of higher education (including assistance for construction, for research, for special training project, for student loans or for any other purpose), the assurance required by this section shall extend to admission practices and to all other practices relating to the treatment of students.

"(2) The assurance required with respect to an institution of higher education . . . insofar as the assurance relates to the institution's practices with respect to admission or other treatment of individuals as students . . . or to the opportunity to participate in the provision of services or other benefits to such individuals, shall be applicable to the entire institution unless the applicant establishes, to the satisfaction of the responsible Department official, that the institution's practices in designated parts or programs of the institution will in no way affect its practices in the program of the institution for which Federal financial assistance is sought, or the beneficiaries of or participants in such programs." (45 C.F.R. § 80.4(d).)

The College executed the required assurance of compliance on February 3, 1965. By their plain language, the regulations require the applicant to furnish information about the entire institution unless the institution successfully carries its burden of showing that the information "will in no way affect its practices in the program of the institution for which federal financial assistance is sought, or the beneficiaries of or participants in such programs." The College did not carry the heavy burden placed upon it by the regulations. Indeed, the College did not try to show that non-federally funded activities and practices could not affect its federally funded programs.

In exercising its investigatory powers, as distinguished from its regulatory or remedial powers, HEW must have substantial latitude in scrutinizing policies and practices of the institution that may have a discriminatory impact on the intended beneficiaries of assistance.[2] For example, if the institution received federal funds under the National Direct Student Loan Program and made those benefits available on an equal basis to all of its students, but the institution refused to admit Spanish surnamed students, potential beneficiaries of the federally funded program would have been denied benefits on the basis of their race. An investigation solely of the administration of the loan program would not reveal the violation.

On the record before us, we have no occasion to decide what information would be relevant to the agency's investigation, what information, if any, would be privileged, or the extent to which, if at all, the agency regulations go beyond the statutory authority committed to the agency.

We are not unsympathetic to the frustrations of college officials faced with demands by HEW officials for massive amounts of information, much of which may ultimately prove useless, and at least some of which may prove to be none of the agency's business. As anyone knows who is familiar with the costs of discovery in civil cases, gathering and collating of information, such as that sought by HEW in this case, is extremely costly and time-consuming. All institutions of higher education operate under severe budgetary constraints and many of them are suffering financial crises caused by very high fixed costs, spiraling inflation, and changed demographics.

Our review of this record suggests to us that an employee of OCR, who initially launched this investigation, was insensitive to the legitimate concerns of the College. His conduct may have produced an atmosphere of such antipathy that voluntary

2. Regulations promulgated to effectuate the agency's regulatory and remedial powers have little relevance in interpreting regulations governing the investigatory powers. Thus, contrary to the College's argument, regulations promulgated to enforce § 602 (42 U.S.C. § 2000d–1) provide no guidance in construing regulations designed to implement the agency's investigatory powers.

compliance thereafter became practicably impossible. Nevertheless, we cannot excuse the College for its failure to comply with the regulations that it accepted in obtaining federal funding, nor can we excuse it from making a record that would support its refusal to do so. All we can do is to ask both the Government and the College to exercise both restraint and good judgment in trying to achieve the ends upon which all parties agree—the highest quality education at the least costly price entirely free from any discriminatory taint.[3]

AFFIRMED.

---

**3.** We are aware of the decisions in *Isleboro School Committee v. Califano* (1st Cir. 1979) 593 F.2d 424 and *Junior College District of St. Louis v. Califano* (8th Cir. 1979) 597 F.2d 119 [No. 78–1830, Apr. 19, 1979]. Neither case is of assistance here. In both *Isleboro* and *Junior College,* the school districts challenged HEW's regulations, promulgated under Title IX, prohibiting discriminatory employment practices by educational institutions. Both Circuits affirmed the respective district courts in holding that Title IX does not embrace employment discrimination. We do not reach the issues in either case because our College did not attack the validity of HEW's regulations in the district court.