**IRON ARROW HONOR SOCIETY, a "tap" or recognition association for men, et al., Plaintiffs-Appellants,**

v.

**Richard S. SCHWEIKER, Secretary of the Department of Health and Human Services, et al., Defendants-Appellees.**

No. 80–5663.

United States Court of Appeals, Fifth Circuit. Unit B

Aug. 3, 1981.

DuFresne & DuFresne, Elizabeth J. DuFresne, Steel, Hector & Davis, Joseph P. Klock, Jr., Miami, Fla., for plaintiffs-appellants.

Drew S. Days, III, Asst. Atty. Gen., U.S. Dept. of Justice, Civ. Rights Div., André M. Davis, Atty., Appellate Section, Walter W. Barnett, Julia Lamer, Dept. of Health and Human Services, Jessica Dunsay Silver, Civ. Rights Div., Dept. of Justice, Washington, D.C., for defendants-appellees.

Before TUTTLE, RONEY and ANDERSON, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from the judgment of the trial court, 499 F.Supp. 496, dismissing a complaint seeking an injunction to forbid the former Department of Health, Education and Welfare from terminating its substantial contribution of federal funds to the University of Miami. The termination threat arose from the fact that Iron Arrow is an honorary-recognition society of the University which elects only men to membership and which the Secretary of HEW had determined gave "substantial assistance" to Iron Arrow.

There are two substantial questions raised by the Society which must be resolved on this appeal: 1) Were the HEW regulations upon which the Secretary acted in excess of the authorization contained in the statute; and 2) Did the University actually contribute "substantial assistance" to the Society?

The regulation in effect at the time of the threatened cutoff of federal funds from the University was Section 86.31(b)(7) which provides that:

Except as provided in this subpart, and providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex: . . .

(7) Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees.

Statutory jurisdiction for the issuance of the regulation is 20 U.S.C. § 1682. It authorizes certain federal agencies, including HEW to issue regulations to "effectuate" the provisions of § 1681.[1] The enforcement provisions of § 1682 provide:

Compliance with any requirement adopted pursuant to this section may be effected 1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the . . . recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found. . . .

20 U.S.C. § 1682.

The Secretary explained the import of the regulation in the following manner:

Section 86.31(b)(7) prohibits a recipient from assisting another party which discriminates on the basis of sex in serving students or employees of that recipient. This section might apply, for example, to financial support by the recipient to a community recreational group or to official institutional sanction of a professional or social organization. Among the criteria to be considered in each case are the substantiality of the relationship between the recipient subject to the regulation and the other party involved, including the financial support by the recipient, and whether the other party's activities relate so closely to the recipient's educational program or activity, or to students or employees in that program, that they fairly should be considered as activities of the recipient itself. (Under § 86.6(c), a recipient's obligations are not changed by membership in any league or other organization whose rules require or permit discrimination on the basis of sex).

39 Fed. Reg. 22229 (1974).

The effect of this interpretation of the regulation is to say that although any cut-

---

1. Title IX provides in pertinent part:

(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

20 U.S.C. § 1681.

off of funds is normally to be limited to the program or activity of the recipient in which the discrimination occurs, a different standard applies where the recipient gives substantial assistance to what is called by the parties an "outside" organization in which event the Secretary is to consider the substantiality of the relationship between the University and the other party and whether the other party's activities relate so closely to the University's educational program or activity, or to students or employees in that program, that these activities should be considered as activities of the University itself. In such event, the regulation would permit the cutoff of federal funds to the University.

■ We conclude that this regulation clearly "effectuates" the provisions of § 1681 with respect to its programs and activities and that it is "consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which" the action is taken. As this Court has said in *Coca-Cola Co. v. Atchison T. & S.F.Ry.*, 608 F.2d 213, 222 (5th Cir. 1979): "Courts generally grant 'great deference' to an agency's interpretation of its enabling statute." *See also Dougherty Co. School System v. Harris*, 622 F.2d 735, 737 (5th Cir. 1980) where we stated that the Secretary is entitled to "great latitude" in effectuating Title IX, 622 F.2d 735, 737 (5th Cir. 1980).

The original notification from the Secretary to the University outlined the nature of the "substantial assistance" which Iron Arrow received from the University in the following discussion:

> The assistance to the Iron Arrow Honor Society is of two types. First, Iron Arrow benefits from recognition and identification with the University, thereby enhancing its prestige. Second, Iron Arrow benefits from tangible support such as secretarial service, alumni mailings, and the use of meeting rooms.

> The following background information, revealed in the investigation, is evidence of the Iron Arrow's recognition by and identification with the University: The

Iron Arrow Society was established in 1926 by Dr. Bowman Foster Ashe, the first President of the University of Miami. In 1950, President Ashe gave the Society a University Charter and "signed into law" a Constitution for the organization, affixing his signature and title as President. According to the organization's head, Iron Arrow is the only campus group to receive a charter from the University.

The Society's constitution, as amended, allows for members to be either male students, faculty, administrative officials, staff or alumni of the University. It is stipulated that members "shall be selected on the prime basis of character and love for Alma Mater, with strong secondary criteria of leadership, scholarship, and humility as defined in the Ritual Book of the Tribe." The now operative amendments of the Society's constitution were "signed into law, A.D. 1971" by the current chief, or head, of the Society, and by you, the President of the University, with your title so designed.

A brochure prepared by the Society says that "Iron Arrow remains the University of Miami's first and most esteemed tradition." The purpose of Iron Arrow as stated in the University's directory of student organization is "to recognize junior and senior men, faculty, staff, and alumni for meritorious achievement and outstanding contributions to the University and its community." In the University's catalogue, reference is made to Iron Arrow as "the highest recognition society for men."

The prestigious position of Iron Arrow is further seen in the location of a monument which stands on a knoll outside the student union building. A plaque thereon says, in part: "Iron Arrow—founded in 1926 as the University's highest honor."

Among other visible signs of Iron Arrow's prestige is a plaque on the wall just inside the entrance to the Ashe Building which houses administrative offices. The names of all members of Iron Arrow are

included on additional mounts on the wall. In front of the plaque is a life-size statute of Dr. Ashe, the University's first President, and the founder of Iron Arrow.

Nearly all of the faculty and students interviewed by the investigators confirmed the fact that Iron Arrow is looked upon as the most prestigious organization on campus, and, as such, is particularly advantageous in employment opportunities.

In addition to the above described recognition received by Iron Arrow from the University, the investigation revealed evidence of tangible support of Iron Arrow from the University. For example, the alumni association does mailings and covers postage for Iron Arrow material, although the organization itself pays for printing costs. The Student Activities Office provides secretarial support. Furthermore, the University assists Iron Arrow by handling three separate accounts from them in the University's finance office. Iron Arrow has a room in the student union building with its name outside the door. Additionally, Iron Arrow utilizes a projection room in the athletic building where it also maintains certain objects or symbols pertaining to the organization.

In addition to a faculty member regularly serving as advisor to Iron Arrow, there is further substantial support for the Society by the University in the various procedures and ceremonies associated with the selection of members. There are "screening committees" in each school of the University, composed of student and faculty members. The "Tapping" ceremony occurs during classes so that, when a faculty member is tapped for membership, he is led away by Iron Arrow members to join others in ceremonies at the monument outside the student union building.

■ Although Iron Arrow and the University agreed thereafter that the latter would cease furnishing all of the physical assistance outlined in the foregoing letter with the exception of the use of the mound in front of the student union building and the statute there for "tapping" for new members, the Secretary insisted that the non-tangible support was still sufficient to constitute "substantial assistance." We have recited the nature of this non-tangible support to indicate the basis on which the Secretary could well conclude that the activities of Iron Arrow in its sex discrimination policies were imputable to the University itself. Iron Arrow simply would not exist but for the University of Miami. The University created the honorary society apparently as an activity of great importance in the building of student morale and leadership. This cannot be denied. Although the University could exist without Iron Arrow, Iron Arrow could not exist without the University. The Society's argument that we should not consider this "substantial assistance" enough to bring it within the regulation simply falls of its own weight.

While we do not reach the ultimate question as to what, if anything, would be done by the University to completely withdraw assistance from Iron Arrow in order to bring itself into compliance without abandoning its males-only policy, we conclude that we are unable to imagine any continued association of the Society with the University of Miami that, in light of its history, would not constitute a continuation of the "substantial assistance" which the trial court found to exist.

We find that no proper final order has been entered in this case under F.R.C.P. 58. The order of dismissal is therefore not appealable. However, the denial of the permanent injunction is appealable and that order we now affirm.

The judgment is AFFIRMED.