Rollin HAFFER, et al.

v.

TEMPLE UNIVERSITY OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION, et al.

Civ. A. No. 80–1362.

United States District Court,
E. D. Pennsylvania.

Oct. 9, 1981.

National Womens' Law Center, Margaret A. Kohn, Nancy Duff Campbell, Marcia D. Greenberger, Washington, D.C., for plaintiffs.

Peter Mattoon, Michael Lehr, Arlene Fisk, all of Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for defendants.

## OPINION

JOSEPH S. LORD, III, Chief Judge.

### I. Introduction

Plaintiffs are women students enrolled at defendant Temple University (Temple). They claim that Temple discriminates against women in the operation of its intercollegiate athletic program[1] in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. (Title IX), and the regulations implementing Title IX issued by the Department of Health, Education and Welfare (HEW), 34 C.F.R. § 106 (1980).[2] Plaintiffs seek to represent the class of all current women students at Temple University who participate, or who are, or have been deterred from participating because of sex discrimination in Temple's intercollegiate athletic program.[3]

Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681. The regulation covering the scope of application of Title IX provides that, unless otherwise stated, the regulations apply "to every recipient and to each education program or activity operated by such recipient which receives or benefits from Federal financial assistance." 34 C.F.R. § 106.11 (1980).[4]

Temple seeks summary judgment. It argues that its intercollegiate athletic program is exempt from the requirements of Title IX because it receives no federal funds earmarked for the use of that program. Temple argues that the implementing regulations are invalid insofar as they cover programs or activities that "benefit from" federal financial assistance but do not receive earmarked funding. Temple asserts that such coverage is beyond the scope of Congress's intent in enacting Title IX.

The parties agree that the intercollegiate athletic program receives no such earmarked federal funds. But, according to plaintiffs' affidavits, Temple receives over nineteen million dollars in federal grants and contracts.[5] In addition, it receives aid in the form of long term loans and interest subsidies for construction and renovation of university buildings. This aid constitutes approximately one-tenth of Temple's annual operating budget.

The issue, then, is the meaning of the statutory phrase "programs or activities re-

---

1. Temple maintains separate intercollegiate athletic programs for men and women. The two programs have separate budgets, leaderships, and positions in the university's organizational structure. This suit and this motion concern Temple's total involvement with intercollegiate athletics. Use of the singular "program" here refers to both the men's and women's entities.

2. The regulations were recodified from 45 C.F.R. § 86 (1980) when the Department of Education was created. 45 Fed.Reg. 30802, 30955 (May 9, 1980).

3. I have not ruled yet on the certification motion.

4. 34 C.F.R. § 106.41 (1980) sets forth the specific requirements of Title IX for equal opportunities in athletics.

5. Temple does not controvert plaintiffs' affidavits. Instead, it argues that these funds are irrelevant because they are not earmarked for the athletic program.

ceiving Federal financial assistance." 20 U.S.C. § 1681. The validity of the regulation turns on Congress's intent in using the word "receiving." For the reasons that follow, I hold that Temple's intercollegiate athletic program is an education program "receiving Federal financial assistance" and, thus, is subject to the requirements of Title IX and of the regulations, which are validly applied here. I therefore will deny defendant's motion for summary judgment.

## II. Legislative History

### A.

Congress used the same language at issue here in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., banning race discrimination in federally funded programs, and in section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, banning discrimination against handicapped persons in federally funded programs. Indeed, Title IX was patterned after Title VI. *Cannon v. University of Chicago*, 441 U.S. 677, 696, 99 S.Ct. 1946, 1957, 60 L.Ed.2d 560 (1979) ("The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years."). Section 504 was also "consciously intended by Congress to track [Title VI]." *NAACP v. Medical Center, Inc.*, 599 F.2d 1247, 1258 (3d Cir. 1979). Therefore, the legislative history of and case law interpreting these statutes are relevant to the question here.

Both Title IX and Title VI have two main provisions. Each has a general statement of prohibition against discrimination—on the basis of sex, 20 U.S.C. § 1681 (Title IX); and on the basis of race, color, and national origin, 42 U.S.C. § 2000d (Title VI). Each also includes a provision authorizing federal agencies to issue regulations to effectuate the general prohibition section. In addition, the second section of each title provides for administrative enforcement through termination or refusal of federal aid to programs and activities after an express finding that discrimination exists in the program or activity. 20 U.S.C. § 1682 (Title IX); 42 U.S.C. § 2000d–1 (Title VI).

In addition to federal agency enforcement under these provisions, the intended beneficiaries are also granted a private right of action to enforce Title IX, *Cannon, supra,* and Title VI, *NAACP, supra.* A private right of action exists to enforce section 504 as well. *Id.*

The purpose of Title VI is "to insure once and for all that the financial resources of the Federal Government—the common wealth of Negro and white alike—will no longer subsidize racial discrimination." 110 Cong.Rec. 7054–55 (1964) (remarks of Sen. Pastore). Title IX was intended to provide appropriate safeguards "parallel to those found in Title VI of the 1964 Civil Rights Act," 118 Cong.Rec. 5803 (1972) (remarks of Sen. Bayh); to put into law "the essential guarantees of equal opportunity in education for men and women," *id.* at 5808.

Temple relies on the legislative history of the administrative enforcement provisions to support its narrow reading of the general prohibitions against discrimination. Concededly, Congress was concerned that wide use of the funding termination mechanism to enforce these statutes would hurt more than help the intended beneficiaries. The administrative enforcement mechanism was therefore limited explicitly to programs or activities in which discrimination actually was found to exist. 20 U.S.C. § 1682; 42 U.S.C. § 2000d–1; 110 Cong.Rec. 7059 (1964) (remarks of Sen. Pastore); *id.* at 7066 (remarks of Sen. Ribicoff). Congress did not want funds cut off from an entire state because of discrimination in one county agency of that state. 110 Cong.Rec. 11942 (1964) (remarks of Attorney General Kennedy). Even with this concern, however, Congress did contemplate wholesale termination of funding in cases in which the whole range of a recipient's programs was infected by discrimination. *Id.* at 7059 (remarks of Sen. Pastore).

■ Congress recognized that the administrative enforcement provision of termination has a more narrow scope than the general statement of prohibition against discrimination. *See id.* at 7058 (remarks of

Sen. Pastore).[6] And both the United States Supreme Court and the Third Circuit recognize that federal funding termination is not always the best way to enforce Title VI or Title IX. *See Cannon, supra; NAACP, supra.* Private actions to enforce the broad remedial rights granted in the general statements of prohibition are not restricted in all respects by the limits on the federal government under the administrative enforcement sections. *Cannon, supra; NAACP, supra.* Temple's reliance on the legislative history to the administrative enforcement provisions thus is misplaced.

### B.

It is obvious from a full reading of the legislative history of the statute that Congress approved of the broad scope of Title IX, and specifically its application to intercollegiate athletic programs.

The original version of Title IX made clear that an institution's receipt of any federal funding brought the entire institution within the scope of the statute. Title IX was first introduced as an amendment to the Education Amendments of 1971. S. 659, 117 Cong.Rec. 30155 (1971). It stated:

> No person in the United States shall, on the ground of sex ... be subject to discrimination *under any program* or activity *conducted by a public institution of higher education,* or any school or department of graduate education, *which is a recipient* of Federal financial assistance for any education program or activity . . . .

Amend. 398, 117 Cong.Rec. 30156 (1971) (emphasis added). The Senate rejected the amendment as nongermane to the bill under consideration. *Id.* at 30415. In 1972, Senator Birch Bayh (D-Ind.) reintroduced Title IX in its current form. There was no explanation or discussion of the wording change. Senator Bayh stated that the new bill was a "comprehensive approach which incorporates ... the key provisions of my earlier amendment ...." 118 Cong.Rec. 5808 (1972) (remarks of Sen. Bayh).[7] The history of the bill through enactment thus is ambiguous.

After enactment, however, there have been at least six attempts to amend Title IX to exclude, in whole or in part, coverage of intercollegiate athletic programs or to limit coverage of Title IX to programs and activities directly funded by the federal government. All of these attempts were defeated. *See* Amend. 1343 to S. 1539, 120 Cong.Rec. 15322 (1974) (Tower Amendment to exclude "revenue producing" intercollegiate athletic activities from Title IX; died in Conference[8]); S. 2106, 121 Cong.Rec. 22775

---

**6.** *See also* Comment, *Eliminating Sex Discrimination in Educational Institutions: Does Title IX Reach Employment?*, 129 U.Pa.L.Rev. 417, 425–26 (1980) ("Sections 1681 and 1682 have different scopes—the former section is a broad prohibition of sex discrimination; the latter section contains a narrow fund termination provision. Reading these sections coterminously ignores the plain language of the statute.") (footnote omitted).

**7.** Congress also revised Title VI before passage. Originally, the bill provided:

> Notwithstanding any provision to the contrary in any law of the United States providing or authorizing direct or indirect financial assistance for or in connection with any program or activity ... no such law shall be interpreted as requiring that such financial assistance shall be furnished in circumstances under which individuals participating in or benefiting from the program ... are discriminated against on the ground of race, color, religion, or national origin. . . .

H.R. 7152, 88th Cong., 1st Sess. (1963); S. 1731, 88th Cong., 1st Sess. (1963). Early in its consideration of Title VI, Congress changed to the more forceful language and structure of the enacted Title VI. In doing so, it also deleted the words "direct or indirect." Although this deletion provides support for defendant's interpretation, Congress acted without explaining its purpose. Further, it did not simply eliminate the words "or indirect," which would have supported defendant's theory more clearly. References to indirectly aided programs appear in the debate after the wording was changed. *See, e. g.,* 110 Cong.Rec. at 7058 ("While the Bureau of Apprenticeship ... provides no *direct* financial assistance to these programs, many of them reap the benefits of other Federal financial assistance, such as that for related classrooms and instructors' salaries.") (emphasis added) (remarks of Sen. Pastore).

**8.** In fact, the Conference Committee substituted an amendment directing HEW to prepare proposed regulations implementing the provisions of Title IX ... which shall include with

(1975) (Tower Amendment reintroduced; not passed by Congress); S.Conc.R. 46, 121 Cong.Rec. 17300 (1975) (Helms Resolution to disapprove proposed regulations applying Title IX to programs and activities not directly receiving federal funds; not reported out of Committee); S. 2146, 121 Cong.Rec. 23845 (1975) (Helms Amendment to limit Title IX coverage to education programs and activities directly receiving federal financial assistance; not passed by Congress); Amend. 389, 122 Cong.Rec. 28136 (1976) (McClure Amendment to redefine "education program or activity" to mean "such programs or activities as are curriculum or graduation requirements of the institution"; defeated by Senate); Amend. 390, 122 Cong.Rec. 28144 (1976) (McClure Amendment to define federal financial assistance as assistance received directly from the federal government, defeated by the Senate).

The congressional debate on the 1976 McClure Amendments focused specifically on the question here—whether Title IX applies to programs receiving only indirect federal financial assistance. *See, e. g.*, 122 Cong.Rec. 28145 (1976) ("The matter before us or the specific vehicle which brings colleges under the regulations; namely, *the receipt of direct or indirect Federal financial assistance directly to the university*, but the inclusion of students who get federal assistance is not unique .... If a student is benefited, the school is benefited.") (emphasis added) (remarks of Sen. Bayh).

I have found nothing in the legislative history reflecting a congressional intent to limit the scope of the general statement of prohibition to programs receiving earmarked federal funds. Instead, the opposite intention appears from the repeated defeats of precisely the limited view Temple now advocates.

Although Congress refused to amend Title IX to limit its coverage to programs receiving direct federal funding, it did adopt two other amendments. In 1974,

respect to intercollegiate athletics activities reasonable provisions considering the nature of particular sports.

Congress amended Title IX to exclude from coverage the membership practices of social fraternities and sororities, the Young Men's and Women's Christian Associations, the Girl and Boy Scouts, the Camp Fire Girls, and voluntary youth service organizations with traditional memberships of one sex principally limited to persons less than nineteen years of age. *See* 20 U.S.C. § 1681(a)(6). In 1976, Congress amended Title IX to exclude from coverage programs and activities of the American Legion taken in connection with the Boys and Girls State and Nation programs, father-son or mother-daughter activities at education institutions, and beauty pageant scholarships. *See* 20 U.S.C. § 1681(a)(7)–(9).

These programs were excluded because they were not among the *education programs and activities* that Congress intended Title IX to cover. 120 Cong.Rec. 39993 (1974) (remarks of Sen. Bayh). The congressional debate on the 1974 amendment shows that Congress amended Title IX to clarify its intent that these noneducational programs not be covered. Congress was not concerned, however, that the funding on which coverage of these programs was based was both direct and indirect. *See, e. g.*, 120 Cong.Rec. 39992 (1974) ("Most of these fraternal organizations could not continue to exist without this kind of *indirect* financial assistance from the colleges and universities .... Title IX would be extended to [the Boy Scouts, the Girl Scouts, YMCA, YWCA, and Camp Fire Girls] based upon the fact that they receive *direct* Federal funds for various educational programs.") (emphasis added) (remarks of Sen. Bayh).

*C.*

■ HEW issued final regulations implementing Title IX three years after enactment of the statute. The interpretation of a statute by the agency charged with its administration is entitled to deference. Sands, 2A *Sutherland's Statutes and Statutory Construction* § 49.05 at 238 (4th Ed.

P.L. 93–380, § 844, 88 Stat. 612 (1974).

1973). Temple argues the application regulation, 34 C.F.R. § 106.11 (1980), is invalid. Under the General Education Provisions Act, 20 U.S.C. § 1232, the regulations did not become effective until forty-five days after promulgation to allow Congress to review and veto them if it so chose. Congress reviewed the regulations exhaustively. The House Subcommittee on Postsecondary Education of the Committee on Education and Labor held six days of hearings to determine if the regulations "as they are written are consistent with the law, or whether they should be returned to the agency for redrafting until they are consistent with the law from which they must draw their authority." *Hearings on Title IX Before the Subcommittee on Postsecondary Education of the House Committee on Education and Labor,* 94th Cong., 1st Sess. 97 (1975) (remarks of Rep. O'Hara) [hereinafter cited as Hearings]. The testimony of the thirty witnesses appearing before the committee and the additional 132 written statements comprise 664 pages. The majority of the witnesses focused on the specific issue relevant here: the meaning of "receiving Federal financial assistance" in the context of intercollegiate athletic programs. *See, e. g., id.* at 46 (Statement of the American Football Coaches Association President Darrell Royal); *id.* at 66 (Statement of Kathy Kelly, President, U.S. National Student Association); *id.* at 321 (Prepared Statement of Dr. Bernice Sandler, Association of American Colleges, submitted by Lynn Heather Mack, Executive Director, Intercollegiate Association of Women Students); *id.* at 401 (Statement of Janet L. Kuhn, attorney). Yet, after this lengthy and strenuous debate on the regulations' coverage of indirectly funded athletic programs, Congress did not reject the regulations as being inconsistent with Title IX..

Congress could not have been unaware of the hot debate over coverage of indirectly funded athletic programs.[9] Twelve members of Congress themselves testified at the subcommittee hearings. Representative Patricia Schroeder testified that she was

> shocked by the hysteria that has surrounded these regulations, especially those relating to sports and athletic programs . . . . The specter of that sacrosanct institution, big time football, dying at the height of its glory, of football heroes in tattered uniforms playing to half-empty stadiums, are alarmist tactics that serve only to cloud the issue.

Hearings at 206 (statement of Rep. Schroeder). Title IX coverage of intercollegiate athletic programs was even the subject of newspaper comic strips at the time of the hearings and later. *See* Reprints in U.S. Commission on Civil Rights, *More Hurdles to Clear, Women and Girls in Competitive Athletics,* Clearinghouse Publication # 63 (July 1980). If Congress had not intended Title IX to cover indirectly funded athletic programs, the intense media and congressional scrutiny of the regulations on athletics should have led to a congressional resolution of disapproval. But it did not.[10]

## III. Case Law

■ The majority of cases interpreting Title IX, Title VI and section 504 support an expansive reading of the phrase "receiv-

---

9. HEW received an unprecedented 9,700 comments on the proposed Title IX regulations. Cox, *Intercollegiate Athletics and Title IX,* 46 Geo.Wash.L.Rev. 34, 40 (1977). Former HEW Secretary Caspar Weinberger remarked, "I had not realized until the comment period [on the Title IX regulations] that athletics is the single most important thing in the United States." *Id.* at 34 (quoting N.Y. Times, June 27, 1975, at 16, col. 4).

10. Effective Aug. 21, 1974, Congress amended the General Education Provisions Act (GEPA) to provide that failure to disapprove regulations does not constitute a finding of consisten-

cy with the underlying legislation. 20 U.S.C. § 1232(d). I rely, here, not on an unexplained failure to disapprove, however, but on Congress's active consideration of the hotly contested regulations, the absence of specific disapproval at a time *before* the GEPA was amended, and on the fact that Congress did amend other parts of the statute in response to regulations proposed by HEW. *See* Part II, B *supra.* Amendment of one part of a statute can indicate approval of a contemporaneous construction of an unchanged part of the law. Sands, 2A *Sutherland's Statutes and Statutory Construction* § 49.10, at 262 (4th Ed. 1973).

ing Federal financial assistance." Civil rights statutes such as Title IX generally are entitled to broad interpretation to facilitate their remedial purposes. *See, e. g., Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S.Ct. 1790, 1795, 29 L.Ed.2d 338 (1971) (Reconstruction Civil Rights Statutes to be accorded "a sweep as broad as [their] language.") (citations omitted); *United States v. El Camino Community College District*, 454 F.Supp. 825 (C.D.Cal.1978), *aff'd*, 600 F.2d 1258 (9th Cir. 1979), *cert. denied*, 444 U.S. 1013, 100 S.Ct. 661, 62 L.Ed.2d 642 (1980) (Title VI to be construed liberally to effectuate its remedial purpose). *See also Cannon*, 441 U.S. at 686 n.7, 99 S.Ct. at 1952 n.7 (the scope and purpose of Title IX place it within the civil rights enforcement scheme that Congress has created over the past 110 years).

The issue here—the meaning of "receiving Federal financial assistance" in section 1681—is of very recent and limited impression. The parties have cited, and I have found, only two cases directly on point. *Bennett v. West Texas State University*, No. CA 2–80–0073–F (N.D.Tex. July 27, 1981); *Othen v. Ann Arbor School Board*, 507 F.Supp. 1376 (E.D.Mich.1981). Both support defendant's position.

In *Bennett*, female undergraduate participants in the West Texas State University athletics program sued the university for operating the program in violation of Title IX. The university was granted summary judgment on the basis that the athletic program received no direct federal funding and, therefore, was not subject to Title IX. *Bennett* and *Othen*, restricted their underpinnings to the limited history also cited by defendant here to hold that Title IX covers only directly funded programs. For the reasons set forth above, I respectfully disagree with the analysis and result in both cases.[11]

The argument that Temple makes here was rejected in the context of section 504 in *Wright v. Columbia University*, 520 F.Supp. 789 (E.D.Pa.1981), and *Poole v. South Plainfield Board of Education*, 490 F.Supp. 948 (D.N.J.1980).

In *Wright*, Columbia University refused to let plaintiff try out for the intercollegiate football team because he had sight in only one eye. The university asserted that section 504 did not cover the program because it received no direct federal assistance. Judge Troutman stated that defendant's argument would allow federally assisted institutions to circumvent federal anti-discrimination policy by allowing them

> to dissect themselves, at whim, into discrete entities, to allocate federal dollars into programs which cannot discriminate against handicapped persons, and to free privately obtained funds from those programs and instead to channel such money into programs purportedly immune from Section 504 strictures.

*Wright*, at 792. In *Poole*, plaintiff was denied the right to participate in his high school's interscholastic wrestling program because he had only one kidney. The court refused to dismiss his section 504 claim. Stating that "[i]t seems absurd to ban discrimination in a discrete area of a school system that receives federal funds while permitting it throughout the rest of the system," the court held "that § 504 is applicable to the interscholastic athletic activities of a school system receiving federal funding even if none of the federal funds are [*sic*] specifically spent on interscholastic athletics." *Poole*, 490 F.Supp. at 951.

Courts have read Title VI to cover all programs at educational institutions that receive federal financial assistance in any form. Congress was well aware of this interpretation at the time that it enacted Title IX. *Cannon*, 441 U.S. at 696–97, 99

---

11. *Othen* is factually distinguishable as well. It dealt with a school district receiving *de minimis* federal impact aid constituting only .12% of the district's total budget. Further, *Othen* arose in a peculiar procedural context. The court actually was ruling on an attorneys' fee petition submitted by the plaintiffs following a settlement. *Othen* resolved the funding nexus issue only in order to determine if the plaintiffs would have prevailed on the merits thereby entitling them to an attorneys' fee award. These peculiarities also persuade me to decline to follow it.

S.Ct. at 1957–58. *See also* 118 Cong.Rec. 18437 (1972) ("Since 1964, there has been ample opportunity to establish enforcement procedure with respect to [Title VI]; enforcement of [Title IX] will draw heavily on these precedents.") (remarks of Sen. Bayh).

In *Bob Jones University v. Johnson*, 396 F.Supp. 597 (D.S.C.1974), *aff'd mem.*, 529 F.2d 514 (4th Cir. 1975), the court held that the defendant university was a recipient subject to Title VI coverage where the only federal financial assistance to the university was veterans' educational benefits paid to some students. The court noted that the VA benefits defrayed the costs of the university's education program and enlarged its pool of qualified applicants. "Grant programs frequently use institutions as conduits through which federal funds or other assistance pass to the ultimate beneficiaries. Clearly, Title VI attaches to a recipient acting in that capacity." *Id.* at 603. *See also Bossier Parish School Board v. Lemon*, 370 F.2d 847 (5th Cir.) (school board's acceptance of federal money for operating expenses subjects entire school system to requirements of Title VI), *cert. denied*, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967); *United States v. Jefferson County Board of Education*, 372 F.2d 836, 850 ("Title VI requires all federal agencies administering any grant-in-aid program to see to it that there is no racial discrimination by any school or other recipient of federal financial aid."), *aff'd en banc*, 380 F.2d 385 (5th Cir. 1966), *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); *Flanagan v. President And Directors of Georgetown College*, 417 F.Supp. 377 (D.D.C.1976) (program-specific approach in section 2000d–1 relates to funding termination efforts of federal agencies and is not a restriction on the types of discrimination outlawed by Title VI; Title VI applies to any services provided in a facility built with federal financial assistance); *Bob Jones University*, 396 F.Supp. at 603 n.22 ("Although the VA payments are not earmarked for school related expenditures, *e. g.*, tuition, all that is necessary for Title VI purposes is a showing that the infusion of federal money through

payments to veterans assists the educational program of the approved school"). *Cf. El Camino*, 454 F.Supp. at 830 (authority of the Office for Civil Rights to investigate compliance with Title VI is not limited to investigation of directly assisted programs of a recipient of federal financial assistance; "[t]herefore, a pinpoint approach, which requires federal administrative action to be conducted on a program by program basis and which has been applied to limit the *power to terminate* federal funding, is not appropriate in this matter") (emphasis in original).

Temple cites *Board of Public Instruction v. Finch*, 414 F.2d 1068 (5th Cir. 1969), in support of its "earmarked funding" requirement. *Finch* was a funding termination case under section 2000d–1 of Title VI. *Finch* held "[s]chools and programs are not condemned enmasse or in gross, with the good and the bad condemned together, but the termination power reaches only those programs which would utilize federal money for unconstitutional ends." *Id.* at 1078. Thus, Temple argues that the funding termination provision is intended to apply only to particular programs and activities in which discrimination exists. *See also Dougherty County School System v. Harris*, 622 F.2d 735 (5th Cir. 1980), *petition for cert. filed*, 49 U.S.L.W. 3495 (U.S. Dec. 22, 1980) (No. 80–1023) (*Finch* analysis applied in Title IX funding termination case.).

A university, however, cannot use federal money to support one graduate program, such as the law school, run that program in perfect compliance with Title VI or Title IX, transfer nonfederal money from the law school budget to the budget of another program, such as the medical school, and deny blacks or women admission to the medical school. Such a scheme would violate Title VI or Title IX even under *Finch* because it would "utilize federal money for unconstitutional ends." *Finch*, 414 F.2d at 1078. "Simple justice requires that public funds, to which taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimina-

tion." *Lau v. Nichols*, 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974) (quoting 110 Cong.Rec. 6543 (1963) (remarks of Sen. Humphrey)).

*Othen* declines to follow the decisions giving a broad scope to Title VI. Because most of the Title VI decisions involve discriminatory admissions practices that necessarily taint the entire institution, the *Othen* court reasoned that they "did not have the institutional/programmatic dichotomy squarely at issue [in Title IX challenges to individual programs]". *Othen*, 507 F.Supp. at 1389. I disagree and find the dichotomy an illusion. Instead, I agree that "[t]o the extent that [an institution] receives federal funding, component entities thereof benefit indirectly through the reallocation of funds received from other sources." *Wright*, at 792. *See also Bob Jones University, supra* (federal veterans benefit payments to students defray university's costs, entire university program, then, is subject to Title VI). In addition, the analysis *Othen* rejects also has been applied in Title VI cases involving claims of individual discrimination. *See Yakin v. University of Illinois*, 508 F.Supp. 848, 850 (N.D.Ill.1981) ("Since the Department and the GEO Program are part of the University, it does not matter whether the University, the Department or the GEO Program receives the federal financial assistance.").

Other Title IX cases also support an expansive reading of the phrase "receiving Federal financial assistance." *Iron Arrow Honor Society v. Hufstedler*, 499 F.Supp. 496 (S.D.Fla.1980), *aff'd*, 652 F.2d 445 (5th Cir. 1981), upheld the Title IX implementing regulation that barred recipient universities from providing substantial assistance to single-sex honor societies. The court stated:

> As a matter of law, the Court finds that this regulation [45 C.F.R. 86.-31(b)(7)], though it may reach activities once-removed from direct federal assistance, is nevertheless useful and necessary to the effectuation of 20 U.S.C. § 1681, which demands an end to federal governmental support of the perpetuation of

discrimination against women in educational institutions. Sexually discriminatory honor societies significantly assisted by federally supported universities perpetuate sexual discrimination. Thus, Congress' authorization ... was not exceeded by H.E.W. Regulation 86.31(b)(7), which reaches organizations that do not *directly* receive federal support.

*Id.* at 503 (emphasis added). *See also Grove City College v. Harris*, 500 F.Supp. 253 (W.D.Pa.1980), *appeal docketed*, No. 80-2383 & 84 (3d Cir. Sept. 29, 1980) (federally funded educational grants and loans received by students are federal financial assistance to defendant university within the meaning of Title IX; university benefits from financial aid to students which otherwise would have to come from the university's own resources, and which enlarges the pool of applicants to the university).

Temple cites several Title IX cases that invalidated the implementing regulations relating to employment practices of recipient institutions. I find these cases unhelpful in resolving the issue here as they focus on whether teachers and other school employees as well as students are intended beneficiaries of Title IX, not on the meaning of the clause "receiving Federal financial assistance." *See, e. g., Seattle University v. United States Department of HEW*, 621 F.2d 992 (9th Cir. 1980), *cert. granted*, 449 U.S. 1009, 101 S.Ct. 563, 66 L.Ed.2d 467 (1980); *Romeo Community Schools v. United States Department of HEW*, 600 F.2d 581 (6th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Junior College District v. Califano*, 597 F.2d 119 (8th Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979); *Islesboro School Committee v. Califano*, 593 F.2d 424 (1st Cir.), *cert. denied*, 444 U.S. 972, 100 S.Ct. 467, 62 L.Ed.2d 387 (1979). *But see North Haven Board of Education v. Hufstedler*, 629 F.2d 773 (2d Cir. 1980) (the program specific limitation on funding terminations under section 1682 does not limit the Department's authority to promulgate regulations; if defendant receives substantial federal financial assistance to pay salaries, employment practices are subject to

Title IX requirements), *cert. granted,* 450 U.S. 909, 101 S.Ct. 1345, 67 L.Ed.2d 332 (1981).

■ I need not decide how substantial federal financial assistance to a university must be for Title IX to cover the programs and activities of that university. The amount involved here is more than nineteen million dollars, constituting more than ten percent of the university's budget. It is clearly substantial enough to meet any reasonable test. This is not, like *Othen,* a case of *de minimis* federal aid.[12]

### IV. Direct Funding

■ Even if Title IX is interpreted more narrowly to apply only to directly assisted programs, I hold that Temple's intercollegiate athletic program is subject to Title IX on an alternative ground not principally relied on by plaintiffs. At least some of the federal funding going to Temple University is closely connected to the intercollegiate athletic program. According to the affidavits and depositions filed by plaintiffs,[13] the federal government paid eighty percent of the wages of over fifty part-time and some full-time employees of the intercollegiate athletic program through the federally funded College Work-Study Program, 42 U.S.C. § 2751. Work-study students are also employed in the Office of Security and Safety, the University Counselling Center, the Learning Resources facilities, the Financial Aid Office, and the University radio station, all of which provide support and services to the intercollegiate athletic program. The radio station also receives money through the Corporation for Public Broadcasting and the Comprehensive Education and Training Act, both federally funded programs.

Intercollegiate athletes at Temple receive several hundred thousand dollars each year in federal financial aid under the Basic Educational Opportunity Grant (BEOG) Program, 20 U.S.C. § 1070a, the Supplemental Educational Opportunity Grant (SEOG) Program, 20 U.S.C. § 1070b, the College Work-Study Program (CWSP), 42 U.S.C. § 2751, the National Direct Student Loans (NDSL) Program, 20 U.S.C. § 1087aa, and the Guaranteed Student Loans (GSL) Program, 20 U.S.C. § 1071. This aid enlarges the pool of student athletes available to Temple and defrays Temple's financial aid expenses just as the tuition benefits in *Bob Jones University* enlarged—the pool of general applicants and defrayed costs.

The intercollegiate athletic program makes direct use of buildings financed with federal funds, including Johnson-Hardwick, Peabody, and Robert Morris Hall dormitories, and Mitten Hall. *Cf. Stewart v. New York University,* 430 F.Supp. 1305, 1314 (S.D.N.Y.1976) ("In sum, plaintiff must show that the Federal financial assistance received by the Law School constitutes more than a *de minimis* portion of its annual revenues and that there is some material connection between said assistance and the minority admissions policy challenged herein." No material connection where federal loan was for construction of a dormitory *not* involved in challenge to minority admissions policy).

---

12. Temple also contends that, to be covered by Title IX, the intercollegiate athletic programs must receive *financial* assistance in the form of actual money, and not simply federal "benefits." It cites *Gottfried v. FCC,* 655 F.2d 297 (D.C.Cir.1981). *Gottfried* held that commercial television FCC licenses, though commodities of great value, did not constitute federal financial assistance within the meaning of section 504. The court looked to the legislative history of Title VI and section 504 and found no references to coverage of such licenses. *Gottfried* is not relevant to this case, however. Plaintiffs do not rely on Temple's receipt of any commercial broadcasting license to establish Title IX's coverage of Temple's intercollegiate athletic program. Instead, plaintiffs assert that Temple receives over nineteen million dollars in federal financial assistance. It is this *money,* from the public fisc, that the plaintiffs claim benefits the intercollegiate athletic programs and subjects them to Title IX coverage. *See also Bob Jones University,* 396 F.Supp. at 602. ("The method of payment does not determine the result; the literal language of Section 601 [42 U.S.C. § 2000d] requires only federal assistance—not payment—to a program or activity for Title VI to attach.").

13. Defendants challenge only the significance, not the accuracy, of these figures. *See* note 5 *supra.*

## V. Conclusion

Logic supports a broad reading of Title IX and supports upholding the validity of the regulations. Congress explicitly amended Title IX to exclude social fraternities and sororities from its coverage. I cannot imagine what possible federal funds could have been earmarked for these programs. If such indirectly (if at all) benefitted programs were never intended to be covered by Title IX, it is inexplicable that Congress felt the need to exempt them specifically on another basis. Congressional consideration of the proposed regulations focused almost exclusively on coverage of athletic programs. Indeed, many opponents of such coverage viewed Title IX as the possible death knell of college sports. If intercollegiate athletic programs, which almost never receive direct federal funding, were not intended to be covered, why was this a burning issue in consideration of the regulations?

> The purpose of Title IX is
>
> to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.

118 Cong.Rec. 5808 (1972) (remarks of Sen. Bayh). Congress considered equal opportunity to participate in school athletic programs a vital part of Title IX. Title IX was intended to do to sex discrimination what Title VI was intended to do to discrimination on the basis of race, color, and national origin. Denial of equal educational opportunities to women is no less illegal, and no more socially useful, than denial of such opportunities to blacks, to members of national minorities, or to the handicapped. I will deny defendants' motion for summary judgment.