William **FERGUSON**, et al., Plaintiffs,

v.

**CITY OF PHOENIX, Defendant.**

**No. Civ. 95–0260 PHX RCB.**

United States District Court,
D. Arizona.

July 17, 1996.

Suzanne M. Dohrer, Haglund, Dohrer & Watts, Phoenix, Arizona, for Plaintiffs.

William R. Jones, Jr., Eileen J. Dennis, Kathleen L. Wieneke, Alisa J. Gray, Jones, Skelton & Hochuli, Phoenix, Arizona, for Defendants.

Robert J. Mather, U.S. Department of Justice, Civil Rights Division, Disability Rights Section, Washington, D.C., Ronald R. Gallegos, Assistant United States Attorney, Phoenix, Arizona, for Amicus Curiae, United States.

## AMENDED ORDER

BROOMFIELD, Chief Judge.

Plaintiffs, William Ferguson, Bonnie Tucker and Jay Frankel, bring this case pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983. Each plaintiff is deaf, and thereby qualifies for ADA protection. Plaintiffs allege that defendant, the City of Phoenix, operates its 911 emergency service in such a way as to discriminate against the hearing impaired, in violation of the ADA. Now before the court is defendant's motion for summary judgment. The United States Department of Justice has been permitted to appear as amicus curiae. Having read the parties' briefs and heard oral argument, the court now rules.

## FACTS

### A. Background.

All plaintiffs in this case have attempted to communicate with the Phoenix 911 system through a telecommunications device for the deaf ("TDD" or "TTY"). A TDD is the standard instrument used by hearing impaired individuals who wish to communicate via the telephone. It is similar to conversing by electronic mail or modem. In order to communicate, both parties must have TDD technology. A TDD caller types in his half of the conversation, which is then transmitted over the phone line and read by the recipient on a display on his TDD. During a conversation only one person can talk at a time because the phone lines can only transit TDD messages one at a time. This makes TDD conversations slower than verbal communication. As a result, a "TDD protocol" has been erected within the deaf community. (United States Br. at 6.) Apparently, "[j]ust as a hearing person will dial a telephone number and wait to hear a person answer

with a greeting before proceeding to speak, a TDD caller will dial a telephone number and wait for the person receiving the call to type a greeting and the 'GA' (go ahead) before beginning to converse in text. The TDD user does not typically press keys while awaiting a response to his or her call. Pressing keys at this time would not be considered common practice among TDD users. It is an additional step that could be considered 'foreign' TDD protocol." (Aff. of Toni D. Dunne at 4, United States Br. Ex. A.)

Some, but not all, TDD's emit an audible "tone" that signals properly trained hearing individuals that the call they have received is a TDD call. Other TDD's have a "TDD announcer" instead of the "tone" feature. The TDD announcer transmits an actual voice recording that informs the other party that they have received a TDD call.

### B. Phoenix's 911 System and TDD Calls.

During the relevant time frame for this suit Phoenix had two separate systems for handling 911 calls placed via TDD. The first was in place before August 21, 1995. Essentially, a TDD call would ring into 911 just like any other call and would be verbally answered by a 911 operator. That call would then be transferred to the one TDD machine located at an auxiliary answering position. This transfer, which occurred manually, required a) the TDD caller to initiate the audible tone, and b) the operator to recognize that tone and transfer the call. In other words, to get the operator to manually transfer the call the TDD caller had to emit the audible tone.

Even after emitting the tone, no typed instructions were given to a TDD caller informing the caller that the call was being transferred or otherwise handled. Once the transfer was completed, the system automatically transmitted the typed message "Phoenix police department, give us your name address and phone number, how can we help you?" This is the same message that is currently transmitted under the City's new 911 system. Normally, however, "all TTY dialogue uses abbreviations[,] and punctuations are not used." (Aff. of Alfred Sonnes-

trahl ¶ 52, PSOF Ex. D.) Again, this is due to the relatively slow speed of TDD communications.

On August 21, 1995, the City implemented its current, upgraded system for handling 911 TDD calls. Now two of the 30 answering booths are equipped with TDD technology. In addition, an automatic diverter system was installed. This system monitors all incoming 911 calls and, if a TDD audible tone is detected, automatically transfers the call to one of the positions equipped with TDD technology. Thus, for this transfer to take place the caller must still initiate the TDD audible tone.

If the system detects a TDD call when all 911 operators are otherwise busy, a message is automatically sent to the caller telling him that he has reached 911 and should remain on the line. That TDD call is then placed in front of all other holding calls. Once freed to handle the call, the 911 operator gets the verbal message "TDD call." This message is repeated until the operator manually transfers the call to a TDD equipped position.

Under either the new or old system, operators receiving silent calls treated these calls as "911 hangups." Under established procedure, operators would hangup on a silent call and then call the caller back on a regular voice phone line. However, according to defendant, "in September of 1995, the City implemented a new procedure whereby an operator who receives a silent call can press '5#' and automatically send a message to a potential TDD caller to press the space bar. If the silent caller is on a TDD, he can then press the space bar and emit the Baudot tone, signalling the diverter to automatically connect to the TDD station." (Def.'s Reply at 6.)

## C. Plaintiffs' Experiences with 911.

In the early morning hours of August 14, 1994, plaintiff Ferguson observed some suspicious looking individuals lurking about the front of his home. He decided to call 911 and report these people to the Phoenix police using his TDD. The 911 operator who answered Ferguson's call, hearing no audible tone or response, hung up, in accordance with defendant's official policy on "silent calls." Also in accordance with that policy, the operator immediately attempted to call Ferguson back. However, the line was busy. That was because, in the interim, Ferguson had placed a second call to 911. The operator who answered the second call heard an audible tone that she recognized as a TDD signal. As a result, she transferred the call to a different operator station, one equipped with a TDD machine. This transfer took 30 seconds to effectuate. Once the call was transferred the operator sent a preprogrammed TDD message to Ferguson. However, that call also was disconnected. Having been disconnected, the operator, pursuant to official policy, dispatched the police to plaintiff's home on a priority two check welfare call. Based upon plaintiff's actual circumstances, however, the police should have been dispatched to Ferguson's residence on a priority one call. Yet, because of the disconnects, plaintiff was unable to communicate the true nature of his emergency.

While the police were en route, Ferguson called 911 twice more. Both calls were answered and subsequently disconnected, despite Ferguson causing his TDD to make the audible tone. Meanwhile, the individuals broke into plaintiff's truck. Having gotten no satisfaction from 911, Ferguson unsuccessfully attempted to thwart the thieves himself.

On January 30, 1995, Ferguson again called 911, this time to report ongoing vandalism on his property. As had happened before, the 911 operator hung up on his call. Ferguson tried calling back. Meanwhile, the operator called Ferguson back but received a busy signal. As a result, she asked U.S. West to break through the line. When the US West operator got no response, the 911 operator again sent the police to Ferguson's home on a priority two basis. As these goings on were unbeknownst to Ferguson, he tried reaching 911 three more times, each time emitting the TDD audible tone. It was only on his fourth attempt that Ferguson was connected to a 911 operator with TDD equipment. Apparently, the three previous operators had failed to recognize the TDD audible tone and, as a result, disconnected these otherwise "silent calls."

On August 28, 1995, Ferguson observed a prowler lurking behind his neighbor's garage. He called 911 as a result. This call was handled under the new 911 system. However, the 911 operator again disconnected his call. This futile process was then repeated. Ferguson then made a third call to 911. After a few minutes delay, he was connected to a TDD operator. However, during the course of that call, Ferguson experienced delays lasting several minutes, during which time he was unable to communicate with the 911 operator.

As a result of these experiences, Ferguson complained on a number of occasions to the City about its 911 service. These various complaints were reviewed by Commander Lyle Rodabough. He acknowledged plaintiff's troubles, expressed his dissatisfaction with the way plaintiff was treated by the system, and vowed corrective action.

On November 25, 1995, plaintiff Tucker called 911 via her TDD. She did so to test the system because her father, who is also deaf, had unsuccessfully tried to reach 911 earlier that evening when he believed he was experiencing a medical emergency. Her first call went unrecognized as a TDD call. On her second call she communicated the purpose of her call to the 911 operator. The operator suggested Tucker hang up and again try to test the system. Tucker then placed three more calls to 911. The first two received no response after 2.5 and 3 minutes on the line, respectively. This, despite Tucker's emission of the TDD audible tone. On the third call the TDD tone was properly recognized.

On December 30, 1995, plaintiff Frankel called 911 to report a theft. His TDD, instead of emitting an audible tone, transmits an actual voice message alerting the other party that his is a TDD call. Despite this verbal announcement, each of his five calls to 911 were disconnected by the various 911 operators who answered his calls.

## DISCUSSION

### I. *Summary Judgment Standard.*

To grant summary judgment, the court must determine that in the record before it there exists "no genuine issue as to any material fact" and, thus, "that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether to grant summary judgment, the court will view the facts and inferences from these facts in the light most favorable to the nonmoving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577, 106 S.Ct. 1348, 1351, 89 L.Ed.2d 538 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. *Id.* at 248, 106 S.Ct. at 2510. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the nonmoving party. *Id.* A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. *See id.* at 250, 106 S.Ct. at 2511. Finally, if the nonmoving party's evidence is merely colorable or is not significantly probative, a court may grant summary judgment. *See, e.g., California Architectural Build. Prods., Inc. v. Franciscan Ceramics*, 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

### II. *Requirements of the ADA.*

Congress, finding among other things that "individuals with disabilities continually encounter various forms of discrimination, including ... the discriminatory effects of ... communication barriers ... [and the] failure to make modifications to existing facilities and practices," enacted the ADA. 42 U.S.C. § 12101. Section 202 of Title II of the ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability ... be denied the benefits of the services ... of a public entity, or be

subjected to discrimination by any such entity." 42 U.S.C. § 12132.

■ In enacting this statute, Congress specifically authorized the Attorney General to promulgate all regulations necessary to implement Title II. 42 U.S.C. § 12134(a). Pursuant to this statutory mandate, the Department of Justice ("the Department") issued regulations that are codified in volume 28 of the Code of Federal Regulations. The overriding concern of those regulations relevant to this case is that a public entity's communications with its hearing impaired citizens be "as effective as [its] communications with others." 28 C.F.R. § 35.160. Thus, public entities that offer 911 emergency service must also provide individuals who use TDD's "direct access" to that service.[1] 28 C.F.R. § 35.162. This means that "TDD's or equally effective telecommunication systems shall be used to communicate with individuals with impaired hearing or speech." 28 C.F.R. § 35.161. Thus, the regulations require that public entities "take appropriate steps, including equipping their emergency systems with modern technology, as may be necessary to promptly receive and respond to a call from users of TDD's and computer modems." 28 C.F.R. § 35.162, App. A at 471. The Department determines compliance by examining the performance of a particular 911 service. *Id.*

Also pursuant to statutory mandate, the Department promulgated the Title II Technical Assistance Manual ("Manual"), to aid in understanding the rights and obligations created by the ADA and its attendant regulations. *See* 42 U.S.C. § 12206(c)(3). The Manual, interpreting the Department's ADA regulations outlined above, elaborates on the requirements of Title II in the 911 context:

*Are any additional dialing or space bar requirements permissible for 911 systems?* No. Additional dialing or space bar requirements are not permitted. Operators should be trained to recognize incoming TDD signals and respond appropriately. In addition, they also must be trained to recognize that "silent" calls may be TDD or computer modem calls and to respond appropriately to such calls as well.

Manual, II–7.3100 at 42 (emphasis in original).

The City, in moving for summary judgment, simply asserted that it does not discriminate against plaintiffs because it provides TDD calls "direct access" to 911. In other words, because no relay service is required for dialing 911, and because the City has 911 TDD capabilities, the City provides direct access to its 911 services. In its reply the City, confronted by the Department's statutorily authorized regulations and their interpretations of them, argues that the court should ignore the Manual's directive that a space bar requirement violates the ADA. The essence of this argument is that, because "there is currently no technology available whereby a 911 system can automatically detect every call from every TDD unit or computer[ ] without the caller hitting the space bar to emit a tone the system can understand[,]" the Department's "no space bar" requirement is arbitrary and capricious. (Def.'s Reply at 18.) In support of this position, defendant cites *Chevron.*

■ It is well settled that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Thus, when Congress has explicitly authorized an agency to promulgate regulations relating to a specific statute, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* This means that the Department's ADA regulations should normally be given presumptive effect.

■ Moreover, "an agency's interpretation of its own regulations is given deference." *Trustees of the Cal. State Univ. v. Riley,* 74 F.3d 960, 965 (9th Cir.1996). Thus, the court must "defer to the [Department's]

---

1. " 'Direct access' means that emergency telephone services can directly receive calls from TDD's and computer modem users without relying on outside relay services or third party services." Department of Justice Title II Technical Assistance Manual II–7.3100 at 41.

interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [Department's] intent at the time of the regulation's promulgation.'" *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (quoting *Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988)). It is with this mandate that the court begins its analysis.

■ *Chevron* is a two step inquiry. First, the court must look to the intent of Congress and see if the agency had the power to act as it did and to determine if Congress has already addressed the issue being challenged. However, "[i]f Congress has not directly addressed the issue, the question is whether the agency's interpretation is reasonable and based upon a permissible construction of the statute." *Romero v. Immigration and Naturalization Service,* 39 F.3d 977, 980 (9th Cir.1994).

■ It is undisputed that Congress has authorized the agency action now being challenged. Moreover, the City does not argue that Congress has directly addressed the space bar issue. Thus, left with what amounts to a step two challenge, the court must inquire whether the Department's "no space bar" interpretation "is reasonable 'in light of the language, legislative history, and policies of the statute.'" *Republican National Committee v. Federal Elec. Cmm'n,* 76 F.3d 400, 405 (D.C.Cir.1996) (quoting *Natural Resources Defense Council v. United States EPA,* 822 F.2d 104, 111 (D.C.Cir. 1987)).

In enacting the ADA, Congress explicitly stated:

It is the purpose of this chapter—

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure the Federal Government plays a central role in enforcing standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

42 U.S.C. § 12101(b). Thus, the purpose of the ADA is clearly both broad and remedial; to ensure "the elimination of discrimination against individuals with disabilities." *Id.*

With regard to 911 service, Congress enacted the ADA with the intention that "the telephone emergency services operated by local and state governments be accessible to [hearing impaired] individuals." H.R.Rep. No. 596, 101st Cong., 2d Sess., 67 (1990). This concern was echoed in the Department's subsequent regulations. *See* 28 C.F.R. § 35.162, App. A at 471 ("The legislative history of title II specifically reflects congressional intent that public entities must ensure that telephone emergency services, including 911 services, be accessible to persons with impaired hearing and speech through telecommunication technology."). Moreover, the House Report on the ADA noted that: "Unlike the other titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit. Therefore the purpose of [section 204] is to direct the Attorney General to issue regulations setting forth the forms of discrimination prohibited." H.R.Rep. No. 485(III), 101st Cong., 2d Sess., 52 (1990).

With this as a backdrop, the court is satisfied that the Department's Manual (which interprets its regulations) is reasonable. The Manual's "no space bar" requirement is consistent with Congress' stated desire to end discrimination against individuals like the plaintiffs. Furthermore, this requirement is reasonable, for it takes into account that not all TDD's emit an audible tone when the space bar is pressed. For "no-tone" TDD users, the City's space bar requirement fails to provide them with same 911 access afforded other TDD users, let alone the non-hearing impaired public. For this reason alone the "no space bar" requirement in neither arbitrary nor capricious.

In short, the City quarrels with the Manual because it disagrees with its substantive

requirements. Although it may be true that the Department's interpretation of the ADA is not the only plausible one, that is immaterial, for it also "reflects a reasonable reading of the statute." *National Republican Committee*, 76 F.3d 400, 405. This is all that *Chevron* requires.[2]

■ The City next asserts that, even if the no space bar requirement is the law, the alternatives are administratively and financially unreasonable. The City accurately notes that the ADA does not "[r]equire a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of the service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3).

The essence of its argument is that to equip every 911 workstation with a TDD, when coupled with other necessary equipment, the redesign of the workstations to create additional space, additional training, a budgetary increase to handle operator overtime, as well as other increased expenses, would cost approximately $1.3 million. However, this argument was first made in defendant's reply. Plaintiffs have not had the opportunity to address it. Without such an opportunity the court declines to address this issue. Defendant may reassert this issue in further briefing if it so desires.

## III. *The Rehabilitation Act.*

Plaintiffs also charge the City with violating the Rehabilitation Act. *See* 29 U.S.C. § 794(a). It provides, in relevant part:

No otherwise qualified individual with a disability in the United States ... shall, solely by reason of his or her disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. *Id.*

Initially, defendant moves for summary judgment on the same basis as it did under

---

**2.** Although the City frames this as a *Chevron* challenge, an argument could be made that, in reality, the question at bar is governed by the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2)(A). First, the court notes that defendant challenges the Department's *interpretation* of its regulations. Such a challenge is governed by *Thomas Jefferson Univ.*, 512 U.S. ——, 114 S.Ct. at 2386. In that case, the party challenging the agency's interpretations did so pursuant to the APA.

Moreover, the District of Columbia Circuit Court of Appeals has recently had occasion to address the dichotomy between *Chevron* and the APA. *See Arent v. Shalala*, 70 F.3d 610 (D.C.Cir. 1995). There, the court was confronted with a challenge to the FDA's regulation defining the term "substantial compliance," as used in 21 U.S.C. § 343(q)(4)(D). Both the parties and the district court analyzed plaintiff's challenge under *Chevron*. The court of appeals, however, in a divided panel, disagreed, holding that "[i]n challenging the FDA's regulation defining 'substantial compliance,' appellants seek traditional arbitrary and capricious review" governed by the APA and its progeny. *Arent*, 70 F.3d at 615. In the majority's view, a *Chevron* challenge concerns " '[t]he *power of an administrative agency* to administer a congressionally created ... program.' " *Id.* (alterations and emphasis in original) (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782). Thus, according to *Arent*, *Chevron* is concerned with whether the agency had the authority to act as it did. However, where the sole issue is whether the agency discharged its authority reasonably, "[s]uch a question falls within the province of traditional arbitrary and capricious review." *Id.* at 616. This is the very essence of the City's challenge.

However, even were the court to analyze this case under the APA, the City's challenge still must fail. The City charges that the Manual is arbitrary and capricious because "the record lacks any evidence that the Department of Justice has accounted for the[] technological considerations [outlined above] in dictating its 'no space bar' guideline." (Def.'s Reply at 20.) However, the City has provided no evidence that the Department did *not* consider technological limitations in interpreting its regulations. In fact, there is no record at all on this question. However, the burden is not on the agency to show that its interpretation is not arbitrary and capricious. Rather, "[t]he burden of proof under the arbitrary and capricious standard is on the party challenging" the agency. *McKinley v. United States*, 828 F.Supp. 888, 892 (D.N.M.1993); *see also Sierra Club v. Robertson*, 810 F.Supp. 1021, 1025 (W.D.Ark.1992) ("Plaintiffs bear the burden on all issues in this case.") (Arnold, Circuit Judge, sitting by designation). Thus, absent evidence that the Department failed to consider technological limitations and that this failure was somehow unreasonable, the court cannot say that the Department's interpretive guidelines are no longer entitled to deference. *Cf. Thomas Jefferson Univ.*, —— U.S. at ——, 114 S.Ct. at 2386. In this regard, mere argument from counsel is insufficient.

the ADA; because it provides "direct access" to TDD callers. However, for the reasons stated above, this argument fails.

Defendant next contends that plaintiffs are not entitled to compensatory damages under the Rehabilitation Act, citing *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992). In *Franklin*, the Court held that an individual, suing under Title IX, is not limited to equitable remedies, and can recover money damages for a defendant's intentional violation of that Act.

■ A number of courts since have looked to *Franklin* to determine whether compensatory damages are available under Title VI. This is because the Court, in finding a damages remedy available under Title IX, cited to cases construing Title VI. These post-*Franklin* cases have uniformly held that compensatory damages under Title VI are available, but only for intentional violations of the act. *See, e.g., Tafoya v. Bobroff*, 865 F.Supp. 742, 749 (D.N.M.1994) (collecting cases); *Tyler v. City of Manhattan*, 849 F.Supp. 1442, 1444 (D.Kan.1994); *Miller v. Spicer*, 822 F.Supp. 158, 166–168 (D.Del. 1993). In this regard, plaintiffs assert that "Phoenix's official policies and practice and its continuing and knowing violations of Plaintiffs' civil rights over more than a year, evinces intentional discrimination deserving of compensatory as well as punitive relief," citing as evidence the entire factual background of this case. (Pls.' Response at 15.)

■ Defendant fails to cite case law dealing with the level of proof necessary to find intentional discrimination in the context of the Rehabilitation Act. Nor has the court's own research unearthed any cases addressing this standard. However, the court notes that in § 1983 cases conduct is intentional when "the policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy, training, protocol or custom." *Penney v. Town of Middleton*, 888 F.Supp. 332, 340 (D.N.H.1994) (citing *Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202–03, 103 L.Ed.2d 412 (1989)). Thus, the inquiry collapses into a search for evidence of such deliberate indifference.

■ The most that has been shown is that the Department's view of the ADA's requirements were set forth in an August 3, 1994 letter from the Department to former Mayor Paul Johnson. Although it informed the Mayor of the Department's 911 settlement with the City of Los Angeles, it made no mention of the no space bar requirement or the Department's binding view of its manual. The letter merely encouraged the City to review its 911 service to ensure that it complied with the law.

This is hardly the stuff of intentional conduct or deliberate indifference. It is a stretch to say that such a letter could create an inference that the City knew what the Department's interpretive Manual required in August of 1994, and yet chose to continue its space bar policy. For compensatory damages based on intentional conduct more compelling evidence is required. Indeed, there is no evidence before the court that the City actually knew of the Manual's requirements. Moreover, plaintiffs' position disregards the other qualities of the City's 911 system and its efforts to address the concerns of plaintiffs and persons similarly situated.

Without more explicit notice that the Manual had the force of law or that the City did not have a good faith belief that the Manual did not have the force and effect of law, the City cannot be held to have acted intentionally or with deliberate indifference to plaintiffs' rights. However, at defendant's request, discovery has been stayed essentially since the inception of this case. Plaintiffs are entitled to test the City's knowledge and belief by appropriate discovery. Hence, it is premature to resolve this issue on the current state of the record.

**IV. *Plaintiffs' § 1983 claim.***

■ Defendant next contends that plaintiffs' § 1983 claim must be dismissed because the ADA and the Rehabilitation Act preclude such relief. In essence, the City argues that, because the ADA and the Rehabilitation Act have comprehensive remedial schemes, a § 1983 claim cannot be predicated on their

violation. "This is a question of first impression in the Ninth Circuit." *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1225 (9th Cir. 1992) (Norris, J., dissenting from majority's dismissal for lack of standing).

■ It is true that, when Congress has enacted a statute with a comprehensive enforcement mechanism, a separate claim for § 1983 enforcement is not available. *Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 21, 101 S.Ct. 2615, 2627, 69 L.Ed.2d 435 (1981). However, the court must " 'not lightly conclude the Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right. The burden is on the State to show by *express provision* or other *specific evidence from the statute itself* that Congress intended to foreclose such private enforcement.' " *Madsen*, 976 F.2d at 1225 (Norris, J., dissenting) (emphasis added) (quoting *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 520–21, 110 S.Ct. 2510, 2523, 110 L.Ed.2d 455 (1990)). In *Madsen*, Judge Norris found that nothing in the Rehabilitation Act itself foreclosed § 1983 relief. Indeed, such a holding has widespread acceptance. *See Penney*, 888 F.Supp. at 340 (collecting cases). Moreover, this analysis yields the same result with respect to the ADA. *See Independent Housing Servs. v. Fillmore Center Assocs.*, 840 F.Supp. 1328, 1345 (N.D.Cal.1993) (relying upon the *Madsen* dissent in holding that "the ADA does not preclude an action under section 1983"). While defendant asserts that "both the ADA and the Rehabilitation Act of 1973 have comprehensive remedial schemes," (Def.'s Motion at 14.), it does so baldly, citing nothing "from the statute itself," express, specific or otherwise, that demonstrates Congress intended to prevent § 1983 relief predicated on a violation of either the ADA or the Rehabilitation Act.

■ The City next argues that plaintiffs' § 1983 claim must fail because they have not produced evidence that the City acted with "at least deliberate indifference to the strong

likelihood that a violation of federally protected rights" would result from its 911 policies. *See Penney*, 888 F.Supp. at 340. This argument has force for the reasons previously noted in the Rehabilitation Act discussion. The City has improved its 911 system. Again, the court cannot say that the letter to the City is sufficient evidence that it acted with "at least deliberate indifference to the strong likelihood" that maintaining its space bar policy would violate the federally protected rights of its hearing impaired citizens. But again, plaintiffs are entitled to discovery on the issue.

V. *Punitive Damages.*

■ Last, defendant argues that, as a matter of law,[3] punitive damages are never available under the ADA, the Rehabilitation Act or § 1983. With respect to the first two statutes, the City cites *Cortes v. Board of Governors*, 766 F.Supp. 623, 626 (N.D.Ill. 1991), in support of its position. In that pre-*Franklin* case, the court held that punitive damages are not recoverable in a Rehabilitation Act claim. However, the court "cannot rely on the case law issued prior to the Supreme Court's decision in *Franklin* to determine the propriety of punitive damages under section 504" of the Rehabilitation Act. *Moreno v. Consolidated Rail Corp.*, 63 F.3d 1404, 1418 (6th Cir.1995). In *Moreno*, the Sixth Circuit concluded that, in the aftermath of *Franklin*, "punitive damages are an appropriate remedy for an intentional violation of section 504." *Id.* However, since the court has concluded that, based on the current record, there is insufficient evidence of an intentional violation, punitive damages would not lie for the alleged Rehabilitation Act violation. But again, plaintiffs have not had their opportunity for discovery.

■ Finally, with respect to their § 1983 claim, the City is correct that plaintiffs are precluded from recovering punitive damages. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981) ("we hold that a munici-

---

**3.** At oral argument the City, for the first time, argued that plaintiffs are not entitled to punitive damages because the facts of this case do not warrant such extraordinary relief. While the court agrees, since this theory was not briefed by either party, the court will not rely exclusively on it.

pality is immune from punitive damages under 42 U.S.C. § 1983").

IT IS ORDERED granting, in civil 96–305 PHX CAM, plaintiffs' motion to consolidate (doc 7). All future pleadings in that case shall be docketed in civil 95–260 PHX RCB.

IT IS FURTHER ORDERED granting, in part, and denying, in part, defendant's motion for summary judgment (doc. 13).

IT IS FURTHER ORDERED denying defendant's motion to strike and for expedited ruling (doc. 108).

IT IS FURTHER ORDERED denying defendant's motion to revoke the participation of the United States as amicus curiae and for expedited ruling (doc. 109).