NATHANIEL R. JONES, Circuit Judge,
dissenting.
The majority finds it unnecessary to remand this case despite the magistrate court’s clear error in applying this Court’s holding in Horner I. The majority also suggests in dicta that we use a discriminatory animus standard, rather than a deliberate indifference standard, in assessing the deprivation of educational opportunities to Kentucky’s female high school softball players. In my view, Supreme Court precedent clearly dictates that we use a deliberate indifference standard in assessing Plaintiffs’ claim. I also believe that Plaintiffs should be afforded the opportunity to meet this deliberate indifference standard below — an opportunity of which they were deprived by the magistrate court’s misreading of this Court’s decision in Homer 1. Accordingly, I respectfully dissent.
I.
We have already delineated the contours of this lawsuit in a previous decision. Although defendant Kentucky High School Athletic Association (“Association”) sane- *699 tions boys’ baseball, it did not recognize “fast-pitch” softball — the practical equivalent of baseball for female athletes — prior to the filing of this lawsuit. See Horner v. Kentucky High Sch. Athletic Ass’n, 43 F.3d 265, 269 (6th Cir.1994). The essence of Plaintiffs’ complaint was that because of Defendants’ failure to recognize fast-pitch competition in Kentucky high schools, Kentucky’s female high school softball players were at a disadvantage in competing for the collegiate benefits and opportunities enjoyed by Kentucky’s male high school baseball players. For example, a significant number of colleges offer financial assistance in the form of athletic scholarships for softball players. See id. Moreover, it seems a given that many college coaches can improve an applicant’s standing with the college’s admissions department by designating the applicant as a “recruit.” Plaintiffs theorized that college softball coaches were reluctant to allocate valuable scholarship monies, or otherwise devote recruiting efforts to Kentucky high school softball prospects, because Kentucky’s softball players were untested and unproven in the fast-pitch game. Kentucky’s high school baseball players, of course, faced no such impediments.
Recently, a district court observed in a similar case that “[f]or too long, the girls’ softball team has been denied athletic opportunity equal to the boys’ baseball team.” Daniels v. School Bd. of Brevard Co., Fla., 985 F.Supp. 1458, 1462 (M.D.Fla.1997). The primary issue in this appeal is whether the district court correctly concluded that Plaintiffs produced no evidence of “intentional discrimination” as a predicate for an award of compensatory damages. An answer to this question will depend entirely on the definition of “intentional discrimination” under Title IX. Plaintiffs urge us to apply a “knowledge” or a “deliberate indifference” standard for “intentional” violations of Title IX. Plaintiffs contend that so long as Defendants were aware of the discriminatory effect of their failure to sanction fast-pitch softball, but nevertheless failed to modify their bylaws to comply with Title IX’s mandates, then they “intentionally” violated Title IX. Defendants counter that “intentional discrimination” under Title IX requires a finding of “discriminatory animus” against Plaintiffs’ gender.
The majority suggests in dicta that Defendants are likely correct in their choice of standard, but holds that Plaintiffs lose as a matter of law in either case. I disagree with both conclusions. First, the Supreme Court has determined that a “deliberate indifference” standard governs whether Title IX is intentionally violated. See Davis v. Monroe Co. Bd. of Ed., 526 U.S. 629, 119 S.Ct. 1661, 1675, 143 L.Ed.2d 839 (1999). Further, because the magistrate court clearly misread the holding of Homer I, and because I believe the majority essentially . rewrites that decision through its reasoning in this case, the majority has, in my judgment, wrongly concluded that Defendants are entitled to summary judgment on monetary damages. To the contrary, Plaintiffs must be afforded an opportunity to meet the Davis stan- ■ dard below.
II.
The starting point for our analysis should be the seminal decision of Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946) in which the Supreme Court stated the oft-repeated principle that
where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.
Id. at 684, 66 S.Ct. 773 (footnotes omitted); see also Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 70-71, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (“[Ajbsent *700 clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute”); Justice v. Pendleton Place Apartments, 40 F.3d 139, 143 (6th Cir.1994) (stating that the burden is on the defendant to demonstrate that Congress did not intend requested relief).
The majority opinion is replete with references to Title IX, but nowhere does it examine closely the statute’s provisions. I submit that to engage in a proper analysis, we must look to the Act itself. The pertinent language of Title IX states: “No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance!!]” 20 U.S.C. § 1681(a). When Title IX was enacted in 1972, it was patterned after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., which banned racial discrimination in federally funded programs. See Cannon v. University of Chicago, 441 U.S. 677, 696, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (“The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years.”). The Supreme Court has observed that the primary purposes of Title IX were (1) “to avoid the use of federal resources to support discriminatory practices;” and (2) “to provide individual citizens effective protection against these practices.” Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 118 S.Ct. 1989, 1997, 141 L.Ed.2d 277 (1998); see also Haffer v. Temple Univ., 524 F.Supp. 531, 533 (E.D.Pa.1981) (Title IX was intended to provide “the essential guarantees of equal opportunity in education for men and women”) (quoting 118 Cong. Rec. 5808 (1972) (remarks of Sen. Birch Bayh)). There is also no doubt that Congress fully intended Title IX to mandate gender equity in scholastic athletic programs. See id. at 534-36 (recounting legislative history and subsequent defeat of various measures that would have limited Title IX’s impact on athletic programs); see also 34 C.F.R. § 106.41(c) (recipients of federal funds must generally provide equality of athletic opportunity to students of both sexes); Yellow Springs Bd. of Ed. v. Ohio High School Athletic Ass’n, 647 F.2d 651, 660-61 (6th Cir.1981) (Jones, J., concurring in part and dissenting in part). Finally, the Supreme Court has recognized that Title IX was enacted pursuant to Congress’s spending power. See Davis, 119 S.Ct. at 1669-70; Franklin, 503 U.S. at 74, 112 S.Ct. 1028. By agreeing to accept federal funds, Defendants essentially contracted with the federal government that they would not discriminate on the basis of gender in athletics. See Gebser, 118 S.Ct. at 1997.
An implied cause of action exists under Title IX. See Davis, 119 S.Ct. at 1669; Gebser, 118 S.Ct. at 1996; Cannon, 441 U.S. at 717, 99 S.Ct. 1946. As noted supra, courts are generally free to “make good on the wrong done” when federal rights have been infringed, subject to only two constraints. Courts are limited in granting relief when (1) Congressional intent is to the contrary, or (2) the purposes of carrying out the statute would be frustrated. See Gebser, 118 S.Ct. at 1996. It is well-accepted that Congress did not intend to limit the available remedies in Title IX cases. See Franklin, 503 U.S. at 72, 112 S.Ct. 1028. Indeed, in 1986, Congress' even abrogated the states’ Eleventh Amendment immunity in Title IX cases. See id. Thus, the remaining question is whether an award of damages to Plaintiffs in this case would frustrate the purposes of Title IX.
In dicta, the majority appears to agree with Defendants’ argument that the “discriminatory animus” standard is appropriate here. The Supreme Court has defined' a discriminatory animus towards women as having “a purpose that focuses upon women by reason of their sex ... directed specifically at women as a class.” Bray v. Alexandria Women’s Health Clinic, 506 *701 U.S. 263, 269-70, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). I believe that, short of a defendant actually defying a court injunction, the “animus” standard will almost never be met in a Title IX athletic-equity case. Cf. Guardians Ass’n v. Civil Serv. Comm’n of New York City, 463 U.S. 582, 632, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (Marshall, J., dissenting).
The excuses for not maintaining gender equity in scholastic athletic programs are all too familiar. School administrators usually justify differences in athletic opportunities between the sexes because of a misperceived lack of interest or ability among female athletes, or because of a belief that altering the status quo in athletic programs is not worth the inconvenience or expense. See generally Cook v. Colgate Univ., 802 F.Supp. 737, 746-50 (N.D.N.Y.1992) (addressing various defenses for college’s failure to grant varsity status to women’s hockey team), vacated as moot, 992 F.2d 17 (2d Cir.1993); Daniels v. School Bd. of Brevard Co., Fla., 995 F.Supp. 1394, 1395 (M.D.Fla.1997) (school board argued that it was too expensive to remedy existing inequities between softball and baseball programs); Pederson v. Louisiana State Univ., 912 F.Supp. 892, 918 (M.D.La.1996) (Title IX violations were “result of arrogant ignorance, confusion regarding the practical requirements of the law, and a remarkably outdated view of women and athletics which created the by-product of resistance to change”).
Yet, purported “unintentional” violations of Title IX are pervasive in our educational institutions even a quarter-century after the statute’s enactment. While much has changed for female athletes since the passage of Title IX, much remains the same. According to the Department of Education, in 1997,
[a]t the high school level, there are still about 24,000 more boys’ varsity teams than girls’ teams; in college, women receive only one-third of all athletic scholarships; and, between 1992 and 1997, overall operating expenditures for women’s college sports programs grew only 89 percent, compared to 139 percent for men, representing only 23 percent of the total operating expenses.
United States Department of Education, Title IX: 25 Years of Progress, Part 6 (1997). Another study conducted on Title IX’s Silver Anniversary concluded that while there had been “significant gains” in athletic opportunities for female college students,
these gains still leave girls and women without their fair share of opportunities to compete. Only 9 percent of Division I colleges provide athletic opportunities for women within 5 percentage points of women’s share of enrollment. Even among Division I schools that do not sponsor football, only 16 percent even come close to providing women with athletic opportunities in proportion to women’s enrollment in the student body.
National Women’s Law Center, Title IX at 25: Report Card on Gender Equity (1997). This study gave educational institutions an overall grade of “C” for Title IX compliance in athletic programs. Id.
Despite these recent statistics, I am not aware of any Title IX athletic-equality case in which the plaintiff could have met the overdemanding “animus” standard of intentional discrimination. As explained above, gender inequities in athletic opportunities are more often-if not always the result of misperceptions, ignorance, or an unwillingness to alter the status quo rather than a conscious decision to treat women differently because they are women. Because the “animus” standard ensures that Title IX defendants will be virtually impervious to a money judgment, they have little incentive to rectify any inequities in their athletic programs until judicially directed. Instead, the “animus” standard allows defendants to remain blissfully ignorant of their Title IX obligations with little fear of having to pay damages for depriving their students of equal athletic opportunities. For this reason, I believe the standard is antithetical *702 to the remedial purposes of Title IX, frustrating, rather than promoting, the Act’s central goals See Gebser, 118 S.Ct. at 2005 (Stevens, J., dissenting).
III.
Moreover, I believe the standard itself rests on flimsy legal ground. The sole source for the “discriminatory animus” standard is Justice White’s plurality opinion in Guardians, 463 U.S. at 584-607, 103 S.Ct. 3221 (White, J.). In Guardians, a class of minority civil employees in New York City brought an action under Title VI of the Civil Rights Act of 1964, contending that the city’s “last hired, first fired” policy had a disparate effect on minority workers.
The issue in Guardians was “whether proof of discriminatory intent [was] required to establish a violation of Title VI[.]” Id. at 615, 103 S.Ct. 3221 (Marshall, J.; dissenting). Seven opinions were filed in the Guardians case, in which a consensus emerged twice. First, a majority of the Court agreed that injunctive and declaratory relief were available for so-called “unintentional” violations of Title VI. Second, a different majority of the Court rejected the workers’ argument that monetary damages were recoverable in cases of unintentional discrimination.[1] Of the seven opinions filed in that case, only Justice White’s opinion suggested a standard for “intentional discrimination.” See id. at 584, 103 S.Ct. 3221 (“I conclude that ... in the absence of proof of discriminatory animus, compensatory relief should not be awarded to private Title VI plaintiffs”) (White, J.); id. at 607 n. 27, 103 S.Ct. 3221 (same). Only one other justice joined Justice White on this issue. See id. at 612, 103 S.Ct. 3221 (Rehnquist, J., concurring in the judgment). Indeed, this Court has already declined to take an expansive reading of Justice White’s opinion in Guardians for the very reason that it did not command a majority of the Court. See Neighborhood Action Coalition v. Canton, Ohio, 882 F.2d 1012, 1015 (6th Cir.1989); see also Bartlett v. New York State Bd. of Law Exam’rs, 970 F.Supp. 1094, 1148-49 (S.D.N.Y.1997), aff'd. in relevant part, 156 F.3d 321 (2d Cir.1998), vacated on other grounds, — U.S. -, 119 S.Ct. 2388, 144 L.Ed.2d 790 (1999);[2] Moreno v. Texas Southern Univ., 573 F.Supp. 73, 77 (S.D.Tex.1983) (recognizing that Justice White’s opinion on damages was not the opinion of the Court); Tyler v. City of Manhattan, 118 F.3d 1400, 1414 (10th Cir.1997) (Jenkins, J., dissenting).
My position that Justice White’s opinion must be kept within its proper bounds is further supported by subsequent Supreme *703 Court decisions. A unanimous Court explained the Guardians holding in an opinion issued the following term: “A majority of the [Guardians] Court agreed that retroactive relief is available to private plaintiffs for all discrimination, whether intentional or unintentional, that is actionable under Title VI.” Consolidated Rail Corp. v. Darrone, 465 U.S. 624, 670 n. 9, 104 S.Ct. 1248, 79 L.Edüd 568 (1984). It seems to me that if the Guardians Court did indeed limit compensatory relief to cases of intentional discrimination involving discriminatory animus, such a limitation would have been acknowledged in Consolidated Rail Corporation’s explanation of Guardians. See Bartlett, 970 F.Supp. at 1148-49. Additionally, another unanimous Court explicitly limited Guardians to situations involving “factors peculiar to Title VI” when it refused to read an intent requirement in § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq., which was another Spending Clause antidiscrimination statute. See Alexander v. Choate, 469 U.S. 287, 294-95 n. 11, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).[3]
Finally, and most significantly, the Court was recently presented in Davis with an opportunity to apply the animus standard as a requisite for monetary recovery under Title IX, but instead ruled that a “deliberate indifference” standard would support a finding of intentional discrimination. In Davis, the plaintiff brought a Title IX action after her complaints of sexual harassment by a fellow classmate were ignored by school officials. See Davis, 119 S.Ct. at 1666-67. The Court noted that the circuits were split for the standard of intentional discrimination in Title IX sexual harassment eases, and that one circuit had endorsed the “animus” standard for monetary recovery in Title IX cases. See id. at 1668-69 (citing Rowinsky v. Bryan Indep. Sch. Dist., 80 F.3d 1006, 1016 (5th Cir.1996) (allowing recovery only upon showing that school responded to harassment claims differently on the basis of gender)). Rejecting Rowinsky and the very “animus” standard urged by Defendants, the Court held that Title IX “makes clear that ... students must not be denied access to educational benefits and opportunities on the basis of gender,” and that such a denial of benefits is to be measured from a “deliberate indifference” and/or an “actual knowledge” standard. Id. 119 S.Ct. at 1675.
*704 In my view, Davis makes abundantly clear that the crucial factor determining whether a defendant has intentionally violated Title IX is notice. Besides, Davis was hardly a revolutionary opinion. Rather, the decision marks the third time that the Court has articulated a “deliberate indifference” standard for Title IX liability in this decade. Both Gebser and Franklin involved a Title IX lawsuit filed against a school district after a teacher had sexually abused the student-plaintiff. In Franklin, the Court authorized compensatory damages under Title IX for the first time, reasoning that “[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity lacks notice that it will be liable for a monetary award. The notice problem does not arise in a case such as this, in which intentional discrimination is alleged.” Franklin, 503 U.S. at 74-75, 112 S.Ct. 1028. The Court ruled that the defendant-school district had “intentionally” violated Title IX because school officials were “aware of and investigated [the teacher’s] sexual harassment of Franklin and other female students [but] took no action to halt it and discouraged Franklin from pressing charges against [the teacher].” Id. at 64-65, 112 S.Ct. 1028. Conversely, in a similar situation six years later, the Court held that the defendant had not intentionally violated Title IX because it had no notice of the sexual harassment. See Gebser, 118 S.Ct. at 1999-2000 (noting that plaintiffs admitted that they could not prevail under an “actual notice” standard).
The majority suggests that the meaning of Gebser and Davis is unclear because they “are not readily analogous to the present situation.” Ante at 692. On the other hand, the majority concludes, Guardians is this case’s “equivalent.” Id. Given that Davis holds that Title IX’s regulations put federal funding recipients on notice of their contractual duties, and given that the regulations state that Title IX is violated when a school’s athletic policies are discriminatory in effect, the majority’s distinguishing of Davis is without significance. Furthermore, I can discern no practical difference between Defendants’ “neutral policy” and a university’s failure affirmatively to gauge the interest for fast-pitch softball among its student body. I find it incongruent that liability under the former should be measured by an “animus” standard while the latter by a “deliberate indifference” standard even though both violations arise under the same statute.
I also believe that such a distinction finds no support in Davis, as the Court again reminded us that Title IX protects students, not schools:
Consider, for example, a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource-an athletic field or a computer lab, for instance. District administrators are well aware of the daily ritual, yet they deliberately ignore requests for aid from the female students wishing to use the resource. The district’s knowing refusal to take any action in response to such behavior would fly in the face of Title IX’s core principles, and such deliberate indifference may appropriately be subject to claims for monetary damages.
Davis, 119 S.Ct. at 1675. I fail to see why the above rule does not apply to Defendants in this case. If a Title IX defendant intentionally deprives a student of educational opportunities when it fails to curb harassment caused by third parties, then surely a defendant likewise intentionally deprives students of those opportunities when it fails to rectify athletic inequities caused by a “neutral policy.” In each situation, the student is being denied the use of school resources on the basis of her gender-precisely the evil Title IX was designed to prevent. And in each situation, the defendant is “well aware” of the deprivation of opportunities. It follows that in each situation, monetary relief should be available.
*705 IV.
Finally, I disagree with the majority’s decision to overlook the district court and magistrate court’s error below, an error which I believe deprived Plaintiffs of the opportunity to satisfy the deliberate indifference standard. Our reviewing responsibility is to correct error, not rationalize it.
The majority concedes that the magistrate court was “technically incorrect” in holding that the Homer I opinion established that there was no intentional discrimination for Title IX purposes as a matter of law. Ante at 694. As the majority acknowledges, the original panel held “that there were genuine issues of fact regarding a Title IX violation.” Id. Yet the magistrate court improperly applied the Homer I panel’s summary judgment on the equal protection claim to the Title IX claim, concluding, as a matter of law, that there was no intentional discrimination under Title IX. J.A. at 340. It further stated that Plaintiffs had not offered additional evidence regarding intentional discrimination since the remand, and thus declared Plaintiffs’ claim for monetary damages “not viable.” J.A. at 340. Despite this clear misreading of Homer I, rather than remanding for the district court to assess whether Defendants were deliberately indifferent to Plaintiffs’ Title IX rights, the majority still finds for Defendants.
I find this result unacceptable. First, I think the majority’s discussion improperly revisits and re-decides the dispute already resolved by Homer I. Over a dissent, the Homer I majority concluded that “genuine issues of material fact abound in this case, and preclude any determination that Defendants have complied with Title IX’s equal opportunity mandate.” 43 F.3d at 275. On this basis, it reversed the district court’s entry of summary judgment for Defendants. Nevertheless, the majority now states that Homer I “did not hold that Plaintiffs made out a prima facie case of a Title IX violation,” Ante at 696, and proceeds to grant summary judgment. I believe that rather than giving Homer I its proper effect, this reading simply echoes the dissent in Homer I, which also reasoned that because Plaintiffs “did not present a prima facie case of a Title IX violation,” summary judgment should have been granted on the Title IX claim. 43 F.3d at 276 (Batchelder, J., dissenting in part). Similarly, when the current majority now concludes that summary judgment is warranted because Plaintiffs have “failed to offer any additional evidence” that Title IX had been violated, it again runs roughshod over the Homer I conclusion that there was a sufficient dispute in the record to withstand summary judgment. Yet again, the majority’s conclusion more closely adheres to the Homer I dissent, which found the record “silent or otherwise inadequate” on the issues “upon which the plaintiffs’ case depends,” and which castigated the Plaintiffs’ statistics showing a disparity between boys’ and girls’ participation in Kentucky high school sports. 43 F.3d at 277 (Batchelder, J., dissenting in part). In sum, I do not believe this Court should stamp its approval on the district court’s clear mishandling of the Homer I remand, let alone rewrite the conclusion of Homer I’s majority in the voice of its dissent.
Second, contrary to the majority, I believe it is certainly possible that the standards of notice and deliberate indifference could be met in this case. Defendants were, after all, the sole entities that could sanction interscholastic sports in Kentucky, and implemented slow pitch softball in 1982. Nor can Defendants argue that they would be unfairly “surprised” by imposition of a monetary award, as were the defendants in Guardians. Three years before Defendants sanctioned slow-pitch softball, the Department of Health, Education and Welfare issued its Policy Interpretation of Title IX. See Title IX of the Education Amendments of 1972; A Policy Interpretation; Title IX and Intercollegiate Athletics, 44 Fed.Reg. 71,413 (Dec. 11, *706 1979).[4] The Policy Interpretation explicitly states that a finding of compliance or noncompliance with Title IX would be based in part on whether the federal funding recipient’s athletic programs “are discriminatory in language or effecfi.]” Id. at 71,417, 71,418; see also 34 C.F.R. § 106.41(c)(1) (“[wjhether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes” is to be considered for Title IX compliance). These regulations provided clear notice to defendants of their Title IX obligations. See Davis, 119 S.Ct. at 1671, 1673 (Title IX regulations inform federal funding recipients of their contractual duties).[5] Providing an environment free from discriminatory effect is a requirement of Title IX. Because Defendants are charged with knowledge of the law, but did not recognize fast-pitch softball until 1994, it follows that remand is appropriate to determine whether Defendants were deliberately indifferent to Plaintiffs’ Title IX rights.
For the foregoing reasons, I would reverse the district court’s dismissal of Plaintiffs’ claims of monetary relief and remand for a determination of whether Defendants were deliberately indifferent to Plaintiffs’ Title IX rights in accordance with Davis. I would also reserve judgment as to whether Plaintiffs were “prevailing par-fies” for attorney fees purposes until after the remand.
V.
Because I believe that the basis for the majority’s affirmance is contrary to the remedial purposes of Title IX, I dissent.

. Justice White summarized the various votes as follows:
Despite the numerous opinions, the views of at least five Justices on two issues are identifiable. The dissenters, JUSTICES BRENNAN, MARSHALL, BLACKMUN, and STEVENS, join with me to form a majority for upholding the validity of the regulations incorporating a disparate-impact standard. See n. 2, supra. A different majority, however, would not allow compensatory relief in the absence of proof of discriminatory intent. JUSTICE REHNQUIST and I reach this conclusion directly. See Parts III and IV, supra; post, at 612, 103 S.Ct. 3221 (REHNQUIST, J„ concurring in judgment). JUSTICE POWELL, joined by THE CHIEF JUSTICE, post, at 608-610, 103 S.Ct. 3221, believes that no private relief should ever be granted under Title VI under any circumstances. JUSTICE O'CONNOR, post, at 615, 103 S.Ct. 3221, would hold that all relief should be denied unless discriminatory intent is proved. It follows from the views of these three latter Justices that no compensatory relief should be awarded if discriminatory animus is not shown.
Id. 463 U.S. at 607 n. 27, 103 S.Ct. 3221 (White, J.).

. Bartlett was vacated in light of the Supreme Court's recent decisions limiting the scope of "disability” under the ADA. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999); Albertsons, Inc. v. Kirkingburg, 527 U.S. 555, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). Nevertheless, I still find Bartlett’s discussion of damages to be a correct statement of the law.

. Incidentally, courts have been very hesitant to hold § 504 plaintiffs to the "animus” standard as a requisite for compensatory relief. See, e.g., Bartlett, 156 F.3d at 330-31; Greater Los Angeles Council on Deafness v. Zolin, 812 F.2d 1103, 1106-09 (9th Cir.1987) (allowing action for monetary relief for discriminatory refusal to provide interpreters to deaf plaintiffs); Miener v. State of Missouri, 673 F.2d 969, 978-79 (8th Cir.1982) (compensatory relief available for § 504 plaintiff; complaint gave defendants adequate notice that they were charged with violating federal antidis-crimination mandates); Love v. McBride, 896 F.Supp. 808, 810 (N.D.Ind.1995) (refusing to accommodate plaintiff despite repeated requests for access amounted to intentional discrimination), aff'd, 103 F.3d 558 (7th Cir. 1996).
In each of these cases, the federal funding recipient denied equal opportunity to the § 504 plaintiff by refusing to provide an accommodation for the plaintiff's disability. Surely there was no "animus” against the disabled plaintiff either individually or as a class in these cases. Rather, these defendants were "indifferent” to their federal obligations very much like defendants in Title IX athletic cases. Nonetheless, the statutory violations were still "intentional” because the defendants had full knowledge of their own discriminatory conduct. As the Second Circuit explained:
[I]ntentional discrimination may be inferred when a "policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the [challenged] policy ... [or] custom.” Ferguson v. City of Phoenix, 931 F.Supp. 688, 697 (D.Ariz.1996), aff'd and remanded [157 F.3d 668 (9th Cir.1998)] ...; see also Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).
Bartlett, 156 F.3d at 331. The Second Circuit's understanding of "intentional discrimination” is in perfect accordance with the Supreme Court's decision in Davis.

. The Policy Interpretation has been cited with approval by several courts, including this one. See Horner, 43 F.3d at 273-74; Cohen v. Brown Univ., 101 F.3d 155, 166 (1st Cir.1996).

. Although similar reasoning with respect to Title Vi’s regulations failed to garner a majority view in Guardians, see 463 U.S. at 628-32, 103 S.Ct. 3221 (Marshall, J., dissenting), there is every reason now, in the fullness of subsequent developments, to accord much more force to Justice Marshall’s convincing arguments with regard to Title IX. Another reason why the Alexander Court limited Guardians to Title VI cases was because, by the time § 504 was enacted, Title VI had been in force for nearly a decade. See Alexander, 469 U.S. at 294-95 n. 11, 105 S.Ct. 712. Title Vi’s enforcement regulations had incorporated a disparate impact standard, and nearly 40 federal agencies had adopted standards in which Title VI was interpreted to bar programs with a discriminatory impact. See Guardians, 463 U.S. at 629-30, 103 S.Ct. 3221 (Marshall, J„ dissenting). In Alexander, the Court theorized that because Congress was well-aware of Title VI regulations prohibiting a discriminatory effect, but took no steps to restrict the remedies available under § 504 (which was based on Title VI), then Congress implicitly rejected an "intentional” standard for § 504 violations. Alexander, 469 U.S. at 294-95 n. 11, 105 S.Ct. 712. Because Title IX was enacted only one year before § 504, it seems safe to suggest that the same implicit assumption applies to Title IX. Indeed, because Davis relies on the Department of Education’s Title IX regulations as providing adequate notice to defendants of their Title IX obligations, Davis is a validation of Justice Marshall's arguments in the context of Title IX cases. See Davis, 119 S.Ct. at 1671.